1

2

3

4

5

6

7

8

9

10

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

11

12

13

14

15

16

17

| | |
|---|---|
| JEANNE SCOTT,<br><br>              Plaintiff,<br><br>   v.<br><br>CAROLYN W. COLVIN, Acting<br>Commissioner of Social Security<br><br>              Defendant. | **Case No. 1:15-cv-684-GSA**<br><br>**ORDER REGARDING PLAINTIFF'S**<br>**SOCIAL SECURITY COMPLAINT** |

18    **I.      INTRODUCTION**

19         Plaintiff  Jeanne Scott ("Plaintiff") seeks judicial review of the final decision of the

20    Commissioner of Social Security ("Commissioner" or "Defendant") denying her applications for

21    Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") benefits

22    pursuant to Titles II and XVI of the Social Security Act.  The matter is currently before the Court

23    on the parties' briefs which were submitted without oral argument to the Honorable Gary S.

24    Austin, United States Magistrate Judge.[1]  After reviewing the administrative record, the Court

25    finds the ALJ's decision is supported by substantial evidence and the Court denies Plaintiff's

26    appeal.

27

28    _____

[1] The parties consented to the jurisdiction of the United States Magistrate Judge. (Doc. 7 and 8).

## II.   BACKGROUND AND PRIOR PROCEEDINGS

Plaintiff filed an application for DIB and SSI on August 26, 2011, alleging a disability onset date of January 1, 2003.[2]  AR 26; 202-217.  Her applications were denied initially on December 30, 2011, and on reconsideration on October 19, 2012.  AR 74-101; 104-133.  Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  ALJ Daniel Heely conducted a hearing on June 11, 2013 (AR 41-73), and published an unfavorable decision on August 6, 2013.  AR 24-40.  Plaintiff filed an appeal, and the Appeals Council denied the request for review on March 4, 2015, rendering the order the final decision of the Commissioner. AR 1-5.

Plaintiff now challenges the denial of benefits, arguing that the ALJ's assessment of the medical evidence was improper.  Specifically, she contends that the ALJ erroneously rejected Dr. Morgan's (an examining psychologist's) opinion because he did not give specific and legitimate reasons for rejecting the doctor's findings.  (Docs. 15, pgs. 6-15; Doc. 21, pgs. 1-5).  Defendant argues that the ALJ provided specific and legitimate reasons to reject Dr. Morgan's opinion by relying on other physicians' reports and other evidence in the medical record. Therefore, the ALJ's decision is supported by substantial evidence. (Doc. 20, pgs. 18-29).

### A.   Medical Record

The entire medical record was reviewed by the Court.  Only evidence relating to Plaintiff's psychological condition is summarized below as this is the basis of Plaintiff's appeal.

#### 1.   Treatment Records

Dr. Apurva Parmar, M.D., examined Plaintiff on January 25, 2006, due to sleep problems AR 981-982. Plaintiff was well, alert, and oriented with normal affect, but had difficulty sleeping as a result of childhood abuse from her mother's boyfriend. AR 981. Dr. Parmar referred Plaintiff for a full psychological evaluation. AR 981.

Plaintiff received in-patient admission (a "5150") to a behavioral health center on April 24, 2006, after presenting a danger to herself. AR 459-63.  Plaintiff reported depression for "several months."  She stated the depression began post-partum three years prior, and alleged poor sleep,

---

[2] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

as well as a preoccupation with "suicidal thoughts." AR 460.  She was diagnosed with major depression, recurrent, and severe, without psychotic features (AR 460), but had no history of psychiatric illness. AR 461.  A Global Assessment of Functioning (GAF) score of 44 was assessed at the time of admission, and increased to 56 at the time of discharge four days later. AR 460.[3]

Dr. Hawant Kaur Gill, M.D. examined Plaintiff on April 6, 2007. AR 1024-1026. He found her slender and appropriately dressed, with psychomotor retardation.  She was depressed, irritable with a sad mood, and restricted affect.  However, she was also pleasant and cooperative, had logical thought process, normal thought content, full orientation, concentration within normal limits, good impulse control, fair insight, good judgment, and was not at risk of suicide. AR 1024. Dr. Gill found poor medication compliance and noted Plaintiff's depression had worsened because she did not take Prozac. He assessed a GAF score of 61-70. AR 1025.[4]  Dr. Gill prescribed additional antidepressants, but Plaintiff decided to wait to consider therapy. AR 1025. A follow-up MRI on April 10, 2007 revealed no significant abnormalities. AR 1027.

Dr. Gill examined Plaintiff again on June 6, 2007. AR 1037-39.  Her depression had improved and she could "do more things," although hearing of her sister's miscarriage caused the depression to worsen again. AR 1037.  She had fleeting suicidal ideation and Dr. Gill felt the need to have Plaintiff and her husband agree that her husband would dispense her medications. AR 1037.  During the exam, Plaintiff was well-groomed, healthy and appropriately dressed. While she had mild psychomotor retardation and was depressed, sad and at times tearful, she also had a pleasant and cooperative demeanor, normal speech, full and appropriate affect, logical thought processes, normal thought content, and was fully oriented, with normal attention,

---

[3] The Global Assessment of Functioning (GAF) Scale from the Diagnostic and Statistical Manual of Mental Disorders (DSM), measures a person's "psychological, social and occupational functioning on a hypothetical continuum of mental health-illness." DSM-IV at p.34. The GAF Scale ranges from 1 to 100, with 1 representing the lowest functioning and 100 the highest; a 41-50 is assigned for "serious symptoms" such as suicidal ideation, while a 51-60 score is for "moderate symptoms," such as flat affect and circumstantial speech, or moderate difficulty in school, occupational or social functioning. *Id.* The GAF Scale is no longer used in the current DSM.

[4] Physicians assign a GAF of 61-70 for "some mild symptoms" such as depressed mood or mild insomnia, or some difficulty in social, occupational or school functioning, but such a patient is "generally functioning pretty well" and "has some meaningful interpersonal relationships."

concentration and intact recent and remote memory, and no suicidal risk. AR 1038. Dr. Gill assessed a GAF score of 71-80, consistent with only transient symptoms. [5]

In a follow-up visit on July 3, 2007, Plaintiff reported improved mood, being more active, goal directed and in control of her life. A social worker assessed a "normal" mental status with a GAF score of 51-60. AR 1041. However, on July 23, 2007, Plaintiff reported feeling more depressed, and claimed she had not gone to work that day due to suicidal thoughts, although she had no plan. AR 1044. In August 2007, a nurse noted Plaintiff had a history of not keeping appointments, including one on August 13th, and diagnosed dysthymia (long-term, non-severe, depressive mood) and posttraumatic stress disorder ("PTSD"). AR 1047. In October 2007, Plaintiff had a normal mental status exam and reported her depression was caused by relationship problems with her husband. AR 1049. Her mental status remained normal in multiple follow-up visits in November 2007 (AR 1054, 1064), and James Kempt, Ed.D. found her GAF score improved to 61-70. AR 1064. On November 30, 2007, Plaintiff reported not taking her medication (Prozac and Wellbutrin) for months because she was "opposed to taking meds (except Ambien),"(AR 1065), but Dr. Gill nevertheless assessed her GAF score as "91-100, no symptoms" AR 1066.

On January 5, 2008, Dr. Parmar replied to Plaintiff's written request for Ambien, expressing concern that she received 120 tablets the previous month, but was requesting yet another prescription. AR 1076-1077, 1078. Plaintiff also asked about hiring opportunities at Kaiser.  She indicated that she was ready to go back to school and expressed interest in attending medical school noting she had worked at Summit Medical Center in Oakland for nine years. AR 1078. In March 2008, Plaintiff continued refused to take antidepression medication (AR 1106), but also received two additional Ambien prescriptions for 130 tablets within a week. AR 1102, 1107-1008.  In March 2008, Plaintiff refused to take antidepression medication (AR 1106), but also received two additional Ambien prescriptions for 130 tablets within a week.  AR 1102, 1107-1108.

---

[5] A GAF of 71-80 is assigned when symptoms "are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument)" and there is "no more than slight impairment in social, occupational or school functioning (e.g., temporarily falling behind in schoolwork)."

1    Plaintiff visited Dr. Gill again in October 2008, after not seeing him since March, and

2  informed him she was "again" off antidepressants for "a long time." AR 1152. Plaintiff wanted to

3  obtain permission for her husband to stay home under the Federal Medical Leave Act because of

4  her depression. AR 1152. Dr. Gill indicated he would be happy to provide that permission

5  when Plaintiff and her husband came in to see him "as & when needed." AR 1152.  Plaintiff

6  received another prescription for Ambien and agreed to reinstate Prozac for depression, but

7  declined to take a mood stabilizer for bipolar disorder. AR 1154. Dr. Gill assessed a GAF score of

8  51-60. AR 1153.

9    Plaintiff missed two consecutive therapy appointments with Dr. Gill on February 26 and

10  27, 2009. AR 1200-01.  When reached by phone, Plaintiff said she forgot about the appointment

11  and blamed menopausal symptoms. She stated she was depressed and had not taken her

12  psychological medications "for weeks." AR 1200. Dr. Gill found chronically poor compliance

13  with both appointments and medication, but nonetheless started her on a new antidepressant,

14  Celexa. AR 1201.

15    Plaintiff visited the Memorial ER in the early morning of April 5, 2009 with complaints

16  of chest pain. AR 405-14. Plaintiff claimed no psychiatric history (AR 406) and was

17  administered the opioid Dilaudid by Jason Allen, RN.  She was discharged the same day with a

18  prescription for Percocet. AR 407, 408.  Four days later, Plaintiff was admitted to Kaiser hospital

19  with the same complaints. AR 1209-1062. Plaintiff appeared alert, well-oriented, and in moderate

20  painful distress; her bipolar disorder was "well-controlled." AR 1217, 1223. Dr. Parmar found

21  Plaintiff improved after receiving Morphine, (AR 1220), but Kulwant Sing Monder M.D. found

22  "very atypical presentation of chest pain" because the entire workup was negative. AR 1225-27,

23  1253-54. In her follow-up visit of April 13, 2009, Plaintiff again appeared well, alert, oriented,

24  pleasant and cooperative. AR 1267.

25    On April, 20, 2009, Plaintiff visited Dr. Gill (AR 1271-74) and said her depression was a

26  "little better."  However, she acknowledged she was not taking any of her antidepressants, despite

27  Dr. Gill's repeated advice to take mood stabilizers. AR 1272. Plaintiff agreed to attend group

28  therapy. AR 1274.

On May 12, 2009, social worker Kathleen M. Goodrich conducted an intake evaluation. AR 1282-1286. Plaintiff claimed she had taken an overdose of pills, but left a note explaining what pills she took in a place her husband would find it, and admitted she did not want to die but wanted "some type of attention from my husband." AR 1283. Although upset and tearful, Plaintiff was well-groomed, slender and appropriately dressed. She exhibited a depressed and anxious mood with restricted affect, but had logical thought process and thought content. AR 1284. Plaintiff was fully oriented, with attention, concentration, memory, and fund of knowledge intact and within normal limits, although she had marginal impulse control, insight and judgment. AR 1284. Ms. Goodrich assessed Plaintiff's GAF score at 41-50. AR 1285.

On May 16, 2009, Plaintiff returned to therapy with Ms. Goodrich and reported anxiety and depression (AR 558), but was "slightly less depressed." She received a higher GAF score of 51-60. AR 559. Plaintiff received another Vicodin prescription on July 14, 2009. AR 567-69, 569.

On August 18, 2009, Plaintiff reported "improved mood" and increased activity, stating she had been working, and received the same GAF score of 51-60. AR 588. She received another opioid prescription on August 24, 2009 after a gynecological exam (AR 593), but failed to attend her exam with Dr. Parmar the following day. AR 597. On August 27, 2009, after requesting additional Ambien, Dr. Gill warned Plaintiff that they could not keep treating her with "addicting sleeping meds only" and needed to treat the cause, namely depression. AR 601.

Plaintiff visited Dr. Gill on September 3, 2009 again for depression. AR 605-609. Dr. Gill re-affirmed the need for "antidepressant/mood stabilizers" because Plaintiff was "severely nonadherent to them" but assessed a GAF score of 51-60. AR 605. Dr. Gill re-prescribed Prozac. AR 608. She had another appointment with Dr. Parmar the following week but again failed to show up. AR 610, 615.

Plaintiff visited Dr. Gill for two more Ambien prescriptions within two weeks on September 21 and October 5, 2009. AR 617, 618. At her October 9, 2009 appointment (AR 619-22), Plaintiff again disagreed with Dr. Gill's diagnosis of bipolar disorder. She refused treatment, and requested that her diagnosis change, which Dr. Gill refused to do because it was an accurate diagnosis. AR 621. Plaintiff noted her husband would lose his job in April, 2010,

which would force her to work harder at her clothing business. AR 620-21. Dr. Gill assessed a GAF score of 81-90, minimal symptoms, with normal euthymic (positive) mood and only mild anxiety. AR 621. Plaintiff informed Dr. Gill that she would find a different psychiatrist. AR 622.

Plaintiff then visited the ER twice, one week apart, in October 2009 (AR 623-628; AR 629-35) for "rotator cuff tear" (AR 625), for which she received the opioid Cyclobenzaprine (AR 630), and for "frozen shoulder" (AR 634), for which she received a 30-day supply of Hydrocodone. AR 635.  Dr. Leena Magdalene Sumitra, M.D., examined Plaintiff one month later on November 9, 2009. AR 652-656.  The purpose of Plaintiff's visit was to change her bipolar diagnosis. AR 652-56. Plaintiff was pleasant and cooperative with normal behavior, normal speech, good mood, and mildly restricted affect.  Her thought process was linear, logical and goal-directed.  She was fully oriented, had normal concentration, attention, memory and fund of knowledge, but exhibited poor impulse control, insight and judgment. AR 654. Dr. Sumitra kept Plaitniff's diagnosis and assigned a GAF score of 51-60. AR 654.

Dr. Sumitra wrote Plaintiff on February 2, 2010 to follow-up on her increased dose of Prozac and to recommend bipolar medications. AR 711. Dr. Sumitra informed Plaintiff she could no longer refill her Ambien because it is "very addictive," that untreated bipolar symptoms were causing her insomnia, and that the Ambien had been refilled thirty seven times since May 2007. AR 711. Plaintiff replied she would not be seeing Dr. Sumitra again because she was "condescending." AR 710.  Plaintiff also indicated that she had "cut down" on taking her Prozac. AR 710.

Dr. Mattice Harris, M.D., examined Plaintiff on July 15, 2010 (AR 512-13) as a new patient for fibromyalgia and prescribed Ambien. AR 513.  She also prescribed the opioid pain killer Ultram during a July 29, 2010 follow-up visit. AR 514. The very next day on July 30, 2010, Plaintiff visited Dr. Parmar and received refills for Oxycodone and Ambien (Zolpidem).  AR 826-30, 830.  The notes contain no mention of her receiving Ultram the previous day from Dr. Harris. Dr. Parmar found Plaintiff alert, oriented and in no distress. AR 828. The doctor again voiced her "worry" of using Oxycodone, Flexeril and Ambien together. AR 829.

Dr. Hamed Rezaishiraz, M.D., examined Plaintiff during Plaintiff's visit to the ER in January 2012 for suicidal ideation. AR 314-27.  Plaintiff reported suicidal intent because she was "unable to cope with the stressors," experiencing "fibromyalgia pain," an inability to get out of bed, low energy, poor attention and concentration, an inability to participate in activities of daily living, and an inability to care for her children, or "take care of her duties as a mother." AR 314. Plaintiff appeared disheveled, with poor eye contact, soft, slow, halting speech, and depressed mood.  However, she was also reactive, with "some signs of elated mood," reflecting bipolar symptoms, including manic episodes which presented as "shopping too much." AR 316.  Plaintiff claimed the suicidal ideation had started eight years ago.  Dr. Rezaishiraz provided an admission diagnosis of "bipolar, depressed without psychosis" with environmental stressors including chronic illness and family problems, and assessed a GAF score of 15-20. AR 314.  Three days later, however, Plaintiff was discharged from the hospital with a GAF score of 50-55 and denied suicidal ideation. AR 314, 315.  Plaintiff was prescribed Paxil, Remeron and Risperdone for depression, Neurontin for anxiety, and Benadryl for insomnia, (AR 315), and was no longer an acute danger to herself. AR 317. Plaintiff also tested positive for amphetamines. AR 323.

### 2. Physicians' Opinions

#### a. Dr. Jacklyn Chandler, Consultative Psychologist

Dr. Jacklyn Chandler, Ph.D., examined Plaintiff on November 29, 2011 at the agency's request. AR 365-68.  Plaintiff reported a history of bipolar disorder, fibromyalgia and depressive episodes, beginning after the birth of her last child in 2003.  She claimed that such episodes could last for several months at a time, but she denied bipolar symptoms such as excessive energy levels, grandiosity, extreme impulsivity, or rapid speech. AR 365. Plaintiff also alleged anxiety, worry, difficulty sleeping, poor concentration, a sense of doom, and intense fearfulness. AR 365. She reported substance abuse, including significant marijuana use in her teens, and cocaine use in her early twenties. AR 366.  Plaintiff indicated that she stopped using these drugs in 1990 after attending a residential treatment program. AR 366.  With regard to activities of daily living, Plaintiff reported she could drive a car, but claimed she could not take a bus.  She could dress and groom herself, wash dishes, do laundry, and prepare simple meals, but she could not go grocery

8

shopping by herself.  AR 366.

During Dr. Chandler's exam, Plaintiff appeared to be in pain and walked with an awkward gait. AR 266.  She had adequate hygiene and clear and coherent speech. She was alert and oriented, with linear thought process, logical thought content, no vision or hearing impairment, and no delusions, hallucinations, or other signs of a thought disorder. AR 366. She had restricted affect, dysphoric mood, was tearful, and her insight and judgment may have been compromised due to psychiatric symptom.  However, Plaintiff reported no suicidal or homicidal ideation, she was genuine and cooperative, and her remote memory was grossly intact. AR 366.

Plaintiff scored a 26/30 on the Folstein Mini Mental State Exam, indicating normal cognition. AR 367. Dr. Chandler assessed Plaintiff with a moderate-level major depressive disorder, with postpartum onset generalized anxiety disorder; pain disorder associated with psychological factors and chronic pain; and cocaine and cannabis dependence in "Sustained Full Remission (by claimant's report)."  She also noted contributing environmental factors including economic problems and inadequate health insurance, and assessed a GAF score of 55. AR 367.

Dr. Chandler found Plaintiff could remember and carry out simple and complex instructions, appeared capable of adapting to workplace changes, had mild difficulty maintaining attention and concentration, but appeared capable of maintaining pace for the duration of the evaluation. AR 367.  Plaintiff had moderate difficulty enduring the stress of the interview, mild difficulty interacting appropriately with the examiner, and appeared to be moderately limited in her ability to interact with the public, coworkers and supervisors. AR 367.  The ALJ gave Dr. Chandler's opinion moderate weight.  However, he had some reservations about the doctor's findings regarding Plaintiff's cognitive and social functioning, as outlined in more detail below.

b.  *Dr. Leif Leaf and Dr. A. Garcia, Non-Examining State Agency Doctors*

On December 22, 2011, Dr. Leif Leaf Ph.D. a non-examining state agency psychologist reviewed the psychological records. AR 81-82; 97-98. Dr. Leaf  completed a mental residual functional capacity assessment and found Plaintiff had an affective disorder with moderate restrictions in activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence and pace, and no episodes of

decompensation.  AR 82. Plaintiff had no understanding or memory limitations. AR 97.

When assessing concentration and pace, Dr. Leaf found that Plaintiff was not significantly limited in her ability to: 1) carry out short and simple instructions; 2) carry out detailed instructions; 3) perform activities within a schedule; 4) maintain regular attendance and be punctual; 5) sustain an ordinary routine without special supervision; 6) work in coordination with, or in proximity to others without being distracted by them; and 7) make simple work-related decisions. AR 97-98. He also found that she was not significantly limited in her ability to: 1) ask simple questions or request assistance; 2) accept instructions and respond appropriately to criticism from supervisors; 3) get along with co-workers or peers without distracting them or exhibiting behavioral extremes; 4) maintain socially acceptable behavior; and 5) adhere to basic standards of neatness and cleanliness. AR 98.  Notwithstanding the above, she was moderately limited in her ability to: 1) maintain attention and concentration for extended periods; 2) complete a normal workday and workweek without interruptions from psychologically-based symptoms; and 3) perform at a consistent pace without an unreasonable number and length of rest periods. AR 97-98. Plaintiff was also moderately limited in her ability to interact appropriately with the general public. AR 98. Given these limitations, Dr. Leaf determined Plaintiff was capable of perfoming simple repetitive tasks with limited interation with the public.  AR 34; 82; 99.

On October 17, 2012, Dr. A. Garcia, M.D., a non-examining state agency doctor reviewed the mental record as part of Plaintiff's request for reconsideration. AR 114-115; 126-127. Dr. Garcia adopted Dr. Leaf's functional capacity and occupational limitations. AR 114-115; 126-130. The ALJ gave both Dr. Leaf and Dr. Garcia's opinions great weight because the findings were supported by the record and took into account Plaintiff's limitations related to concentration, insight, judgment, impulse control, mood and affect.  AR 34.

c.  *Dr. Robert Morgan, Ph.D., Consultative Psychologist*

Dr. Robert L. Morgan, Ph.D., examined Plaintiff at her request on November 27, 2012. AR 1305-1317.  Plaintiff told Dr. Morgan she stayed in bed "most of the time;" was inattentive to hygiene and did not shower for days; had chronic insomnia; lacked hobbies; did not participate in domestic activities; had a variable appetite; did not drive regularly; did not see friends or use

10

the telephone; and did not go to church anymore. AR 1307-1308.

Dr. Morgan observed poor grooming and hygiene, but found Plaintiff appropriately attired, with fair eye contact.  She was calm and cooperative; provided simple and direct answers; and showed no evidence of malingering, fictitious, bizarre, or unusual behavior. AR 1307-1308. Plaintiff presented as severely depressed and tearful, with a flat fixed unchanged affect. However, she was coherent, cohesive, organized, logical and goal-directed in her thought processes; denied hallucinations or other abnormal thoughts such as obsessions, phobias, compulsions, or depersonalization; and denied homicidal ideation.  Although she acknowledged suicidal ideation, she denied any current plan or intent. AR 1308.

Dr. Morgan noted Plaintiff's concentration was impaired, however, she was alert; ambulatory; and oriented as to person, place, time and situation.  She exhibited an average IQ and correctly identified the month and year. She had a fair fund of knowledge; fair memory and satisfactory calculations; abstract thinking and knowledge of similarities and differences; and fair insight and judgment. AR 1308-1309.  Dr. Morgan found Plaintiff tearful about "every little thing" with feelings of worthlessness and guilt, which he interpreted as "a person who is reporting significant distress with particular concerns about physical functioning." AR 1309. Dr. Morgan diagnosed bipolar disorder, and cited unemployment and economic influences, assessing Plaintiff's GAF score at 50. AR 1310.

Dr. Morgan opined that Plaintiff was disabled based on "12.04, an affective disorder" (one of the Commissioner's listed impairments). AR 1310-11. In doing so, Dr. Morgan found Plaintiff was "markedly" impaired in every functional activity he addressed including restrictions in daily living, as well as difficulties maintaining concentration, persistence, and pace.  He further opined that Plaintiff could not complete a normal workday, that her condition would deteriorate in a workplace setting, and that she had a "poor" prognosis. AR 1310-1311. The ALJ gave Dr. Morgan's opinion little weight for the reasons discussed in more detail below.

### III.  THE DISABILITY DETERMINATION PROCESS

To qualify for benefits under the Social Security Act, a plaintiff must establish that he or she is unable to engage in substantial gainful activity due to a medically determinable physical or

1   mental impairment that has lasted or can be expected to last for a continuous period of not less

2   than twelve months.  42 U.S.C. § 1382c(a)(3)(A).  An individual shall be considered to have a

3   disability only if:

> . . . his physical or mental impairment or impairments are of such severity that he
> is not only unable to do his previous work, but cannot, considering his age,
> education, and work experience, engage in any other kind of substantial gainful
> work which exists in the national economy, regardless of whether such work
> exists in the immediate area in which he lives, or whether a specific job vacancy
> exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

8       To achieve uniformity in the decision-making process, the Commissioner has established

9   a sequential five-step process for evaluating a claimant's alleged disability.  20 C.F.R. §§

10  404.1502(a)-(f), 416.920(a)-(f).  The ALJ proceeds through the steps and stops upon reaching a

11  dispositive finding that the claimant is or is not disabled.  20 C.F.R. §§ 416.920(a)(4) and

12  404.1502(a)(4).  The ALJ must consider objective medical evidence and opinion testimony.  20

13  C.F.R. §§ 404.1527, 416.1529, 416.927, and 416.929.

14      Specifically, the ALJ is required to determine: (1) whether a claimant engaged in

15  substantial gainful activity during the period of alleged disability, (2) whether the claimant had

16  medically-determinable "severe" impairments,[6] (3) whether these impairments meet or are

17  medically equivalent to one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P,

18  Appendix 1, (4) whether the claimant retained the residual functional capacity ("RFC") to

19  perform his or her past relevant work,[7] and (5) whether the claimant had the ability to perform

20  other jobs existing in significant numbers at the regional and national level.  20 C.F.R. §§

21  404.1520(a)-(f), 416.920(a)-(f).

22      **A.      The ALJ's Decision**

23      Using the Social Security Administration's five-step sequential evaluation process, the

24  ALJ determined that Plaintiff did not meet the disability standard. AR 21-40.  Specifically, the

---

[6] "Severe" simply means that the impairment significantly limits the claimant's physical or mental ability to do basic
work activities.  *See* 20 C.F.R. §§ 404.1520(c), 416.920(c).
[7] Residual functional capacity captures what a claimant "can still do despite [his or her] limitations."  20 C.F.R. §§
404.1545, 416.945.  "Between steps three and four of the five-step evaluation, the ALJ must proceed to an
intermediate step in which the ALJ assesses the claimant's residual functional capacity."  *Massachi v. Astrue*, 486
F.3d 1149, 1151 n. 2 (9th Cir. 2007).

ALJ found that Plaintiff met the insured status requirements through June 30, 2006, and that Plaintiff had not engaged in substantial gainful activity since January 1, 2003, the alleged onset date in the applications. AR 26.  The ALJ identified fibromyalgia, major depressive disorder, bipolar disorder, generalized anxiety disorder, and pain disorder as severe impairments. AR 26-27.  Nonetheless, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. AR 27-28.

Based on the review of the entire record, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform medium work, except she was limited to simple, routine, repetitive tasks; and could only have occaisional contact with the public. AR 28-34.  Based on this RFC, the ALJ determined that Plaintiff could not perform her past relevant work as receptionist, but could perform work as a hand packager, a floor waxer, and an order picker. AR 36.

## IV.    STANDARD OF REVIEW

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations, this Court must determine whether the decision of the Commissioner is supported by substantial evidence.  42 U.S.C. § 405(g).  Under 42 U.S.C. § 405(g), this Court reviews the Commissioner's decision to determine whether:  (1) it is supported by substantial evidence; and (2) it applies the correct legal standards.  *See Carmickle v. Commissioner*, 533 F.3d 1155, 1159 (9th Cir. 2008); *Hoopai v. Astrue*, 499 F.3d 1071, 1074 (9th Cir. 2007).

"Substantial evidence means more than a scintilla but less than a preponderance." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002).  It is "relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion."  *Id*.  "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld."  *Id*.

///

///

13

## V.     DISCUSSION

### A.     The ALJ Properly Weighed the Medical Evidence.

Plaintiff argues that the ALJ erroneously rejected Dr. Morgan's opinion. Specifically, she contends that the ALJ rejected Dr. Morgan's opinion because Plaintiff had average intelligence, intact thought, and fair memory, knowledge, insight and judgment.  However, these findings do not conflict with Dr. Morgan's other assessment that Plaintiff had limitations in the area of concentration, persistence, and pace. Moreover, she contends that the ALJ's reliance on Dr. Chandler's report as a basis to reject Dr. Morgan's opinion was improper because the ALJ had already dismissed Dr. Chandler's findings for several reasons.  Therefore, using Dr. Chandler's opinion as a basis to reject Dr. Morgan's opinion was misplaced. (Doc.15, pgs. 6-15; Doc. 21, pgs. 1-4).

The Defendant argues that that ALJ properly considered the entire medical record and gave specific and legitimate reasons for rejecting Dr. Morgan's opinion including relying on other other physician's opinions and citing other evidence in the medical record.  Therefore, the ALJ's evaluation of the medical record is supported by substantial evidence. (Doc. 20, pgs. 22-29).

### 1.   The Law

The opinions of treating physicians, examining physicians, and non-examining physicians are entitled to varying weight in disability determinations.  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996).  Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual.  *Id.*; *Smolen v. Chater*, 80 F. 3d 1273, 1285 (9th Cir. 1996).  However, the opinions of a treating or examining physician are "not necessarily conclusive as to either the physical condition or the ultimate issue of disability."  *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999).  An ALJ may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons. *Lester*, 81 F.3d at 831. In contrast, a contradicted opinon of a treating profressional may be rejected for "specific and legitimate" reasons. *Id*. at 830.

The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a non-examining physician. *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990);

1   *Gallant v. Heckler*, 753 F.2d 1450 (9th Cir. 1984).  As is the case with the opinion of a treating

2   physician, the Commissioner must provide "clear and convincing" reasons for rejecting the

3   uncontradicted opinion of an examining physician. And like the opinion of a treating doctor, the

4   opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for

5   specific and legitimate reasons that are supported by substantial evidence in the record. *Lester,* 81

6   F.3d at 830.

7        Notwithstanding the above, the opinion of a non-examining physician may constitute

8   substantial evidence when it is "consistent with independent clinical findings or other evidence in

9   the record." *Thomas*, 278 F.3d at 957.  Such independent reasons may include laboratory test

10  results or contrary reports from examining physicians, and Plaintiff's testimony when it conflicts

11  with the treating physician's opinion.  *Lester*, 81 F.3d at 831, *citing Magallanes v. Bowen*, 881

12  F.2d 751–755 (9th Cir. 1989).

13       *1.  Analysis*

14        Here, the ALJ gave a comprehensive summary of the medical record. AR 27-24.  In doing

15  so, he accorded the various psychologists reports differing weight.   After accurately summarizing

16  Dr. Morgan's opinion (AR 31-33), he stated as follows:

17

18        The undersigned grants little weight to Dr. Morgan's findings, as the record does
     not support them. Although the claimant did have somewhat diminished mental
19   functioning during the consultative examination with Dr. Morgan, including impaired
     concentration, she also had average intelligence, intact thought, and fair memory,
20   knowledge, insight, and judgment.  Additionally, throughout the record, she generally
     demonstrated intact memory, concentration, attention, and thought, including a
21   demonstration of very good mental functioning at the prior consultative examination  In
     summary, the overall record and even Dr. Morgan's own objective findings do not support
22   a finding of marked limitation. AR 33 (citations omitted).

23

24   When evaluating Dr. Chandler's opinon the ALJ stated as follows:

25

26        … The undersigned grants moderate weight to this opinion.  Although her finding
     that the claimant could perform complex work is supported by the claimant's
     demonstration of normal thought during the examination, Dr. Chandler never tested the
27   claimant's cognition or ability to take on multi-step instructions, thus detracting from her
     assessment of the ability to perform complex work.  Further, Dr. Chandler's finding of a

28

"moderate" difficulty in enduring stress and relating to others is vaque and unhelpful to this determination. Dr. Chandler never states what the claimant can or cannot do with regard to these limitations.  Additionally, it appears to be based on the claimant's self-reported history.  Regardless, the undersigned elects to limit the claimant to unskilled work and occiassional interation with the public, a finding that is entirely consistent with Dr. Cahndler's opinion. AR 33

When reviewing the two state agency doctors, the ALJ noted the following:

Dr. Lief Leaf and Dr. A. Garcia, also state agency medical consultants, opined that the claimant had no greater than moderate mental limitations and was capable of unskilled work with limited interaction with the public. The undersigned grants great weight to these opinons, as they are supported by the claimant's regular demonstration of intact thought and memory, but also takes into consideration her limitations to concentration (unskilled work) as well as limitations to insight, judgment, impulse control, mood, affect (limited contact with the public).  AR 34 (citations omitted).

Thus, after reviewing all of the psychologists' opinons, the ALJ gave the greatest weight to Dr. Leaf and Dr. Garcia's (the non-examining doctors) assessments which recommended unskilled work with limited interation with the public. AR 34. In doing so, the ALJ noted Plaintiff had intact thought and memory skills, but had limitations with regard to concentration, impulse control, mood and affect, and limited Plaintiff to limited contact with the public. AR 34. The ALJ found that these findings best reflected Plaintiff's documented limitations in the record and incorporated these findings into the RFC. AR 28-34. When formulating the RFC, the ALJ found as follows:

Regarding the claimant's mental functioning, despite her bipolar disorder, depression, and anxiety, she often demonstrated normal thought, memory concentration, and attention. However, occasionally, she exhibited diminished concentration, insight, judgment, impulse control, mood, and affect. Because of the diminished concentration, it is reasonable to conclude that she would be limited to unskilled work.  Because of the diminished insight, judgment, impulse control, mood and affect, and because the claimant is allegedly withdrawn from a social standpoint, it is reasonable to also limit her to only occasional contact with the public.
AR 32.

Notthwithstanding the above, Plaintiff argues that the ALJ improperly rejected Dr. Morgan's opinion which assessed greater limitations. Specifically, Plaintiff argues that while the ALJ relied on Dr. Chandler's findings that Plaintiff had nomal thought processess during the examination, he rejected Dr. Chandler's

16

1   assessment to do complex work because it was not based on any objective testing.  Plaintiff

2   contends that since the ALJ found Dr. Chandler's results were unreliable, it is improper for the

3   ALJ to rely on this opinion as a basis to reject Dr. Morgan's findings.  In other words, the ALJ

4   cannot find Dr. Chandler's report unreliable because it was not based on objective findings or

5   testing, then claim that these findings are sufficient evidence for rejecting Dr. Morgan's opinion.

6   (Doc. 15, pgs. 8-12; Doc. 21, pgs. 1-3).

7       After reviewing the medical record and the ALJ's analysis, the Court disagrees with

8   Plaintiff's characterization of the ALJ's decision, and finds that the ALJ gave specific and

9   legitimate reasons for rejecting Dr. Morgan's opinion.  First, as Defendant notes, even though the

10  ALJ found Dr. Chandler did not assess functional limitations, the ALJ gave "moderate" weight to

11  Dr. Chandler's opinion.  The ALJ did so in spite of the fact that the doctor did not perform

12  objective testing related to Plaintiff's ability to do complex work, and only provided a "vague"

13  and "unhelpful" assessment of her ability to handle stress and relate to others. AR 33.  Based

14  partly on Dr. Chandler's findings, however, the ALJ limited Plaintiff to unskilled work and

15  limited interaction with the public, which he felt was "entirely consistent with Dr. Chandler's

16  opinion." AR 33.  Thus, the ALJ did not "provide two theories" of Dr. Chandler's opinion, but

17  rather credited her exam to the extent that it did not show marked limitations, while assessing a

18  more restrictive RFC than the report suggested.

19      Second, when the ALJ rejected Dr. Morgan's opinion, he also noted that although Plaintiff

20  had somewhat diminished mental functioning during the exam with Dr. Morgan, including

21  impaired concentration (which the ALJ addressed by limiting Plaintiff to simple, routine

22  repetitive tasks), she exhibited normal functioning in other areas.  Thus, the ALJ noted that Dr.

23  Morgan's findings of marked limitations in concentration, persistence, and pace, maintaining a

24  schedule, completing a normal workday and work week without interruption was inconsistent

25  with the presentation of Plaintiff's symptomatology at the time of the assessment. AR 33.  This is

26  a specific and legitimate reason for rejecting the opinion. *Thomas*, 278 F.3d at 957 (An ALJ need

27  not accept a medical opinion that is brief, conclusory, or inadequately supported by clinical

28  findings); *Magallenes v. Bowen*, 881 F. 2d at 751 (A lack of supporting clinical findings is a

17

1  legitimate reason to reject a physicain's opinon); *Tommasetti v. Astrue*, 553 F. 3d 1035, 1041 (9th

2  Cir. 2008) (The incongruity between a physician's opinion and the patient's record is a specific

3  and legitimate reason to discount a physician's opinion).

4      Additionally, the ALJ also performed his own assessment under 12.04, 12.06, and 12.07,

5  and found that Plaintiff only had mild limitations in acitivites of daily living, and moderate

6  limitations in social functioning and concentration, persistence, and pace.  AR 27. In doing so, he

7  relied on Plaintiff's function reports and her testimony at the hearing wherein she indicated that

8  she performs light housework and chores, cooks meals, uses a computer, attends church, has

9  taken trips to Los Angeles, and had started her own business. AR 27.  Thus, the ALJ relied on

10 other parts of the medical record to support the lack of marked limitations in the functional areas

11 of the 12.04 assessment, further discrediting Dr. Morgan's findings. AR 27-28; 32.

12     The ALJ also noted that during Dr. Chandler's evaluation and *throughout the record*, the

13 Plaintiff demonstrated intact memory, concentration, attention, thought and good mental

14 functioning. The ALJ pointed to those intances in the record earlier in the opinion when

15 evaluating Plaintiff's mental functioning as part his RFC assessment. AR 30-32; 365-368; 391;

16 411; 431; 524; 654; 828; 1025; 1037.  Although Plaintiff argues that the ALJ selectively focused

17 on information in the record to support his conclusions, the ALJ also noted that Plainitff had poor

18 insight and judgment and he also incorporated those limitations into the RFC by limiting Plaintiff

19 to simple repetitive tasks. AR 31-32; 460-463; 654; 1025.  Even though Plaintiff disagrees with

20 the ALJ's conclusions regarding this evidence, she fails to establish any legal error with the

21 ALJ's analysis. Instead, she merely sets forth her interpretation of the same evidence the ALJ

22 analyzed and asks the court to choose her interpretation over the ALJ's analysis. (Doc. 15, pgs. 9-

23 12).  While the Court is sympathetic to Plaintiff's case, where more than one rational

24 interpretation of the evidence exists, the ALJ's conclusion must be upheld. *Thomas*, 278 F.3d at

25 954; *Magallanes*, 881 F.2d at 750.

26     Finally, when formulating the RFC the ALJ gave the greatest weight to Dr. Leaf and Dr.

27 Garcia's opinions which found that Plaintiff could do simple repetitive tasks.  It is well

28 established that the ALJ is responsible for determining credibility and resolving conflicts in

1   medical testimony." *Magallanes v. Bowen*, 881 F.2d at 750.  These contradicting opinions form a

2   valid basis to reject Dr. Morgan's opinion as an ALJ may choose to give more weight to an

3   opinion that is more consistent with the evidence in the record.  20 C.F.R. §§ 404.1527(c)(4),

4   416.927(c)(4) ("the more consistent an opinion is with the record as a whole, the more weight we

5   will give to that opinion"); *Valentine v. Astrue*, 574 F.3d 685, 692-93 (9th Cir. 2009) (ALJ

6   properly gave greater weight to examining physician and State agency physician when evaluating

7   RFC and rejecting another doctor's contradictory opinion).  As a result, the ALJ provided specific

8   and legitimate reasons for rejecting Dr. Morgan's opinion which are supported by substantial

9   evidence.

10          The Court notes that Defendant offers several *post hoc* justifications supporting the ALJ's

11   decision including Plaintiff's frequent visits to care providers for the purpose of seeking out

12   prescription drugs,[8] as well as several other reasons for rejecting Dr. Morgan's opinion. (Doc. 20,

13   pgs. 25-29).  However, a reviewing court cannot affirm an ALJ's decision denying benefits on a

14   ground not invoked by the Commissioner.  *Stout v. Comm'r*, 454 F.3d 1050, 1054 (9th Cir. 2006)

15   (citing *Pinto v. Massanari*, 249 F.3d 840, 847 (9th Cir. 2001)); *Connett v. Barnhart*, 340 F.3d

16   871, 874 (9th Cir. 2003).  Therefore, the Court has not relied on these reasons as part of its

17   analysis as these reasons were not articulated by the ALJ.

18   ///

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26   _____

27   [8]In support of this argument, Defendant has cited to several instances in the record where Plaintiff received
prescribed narcotic drugs during doctors' and ER visits. (Doc. 20, pg. 5, ln 15-25;  Doc. 20, pg. 6, n. 6, ln 16-28).
*See also*, AR 369-377; 387; 439-443; 662-669; 681-703; 713-717; 724-734; 743-751; 756-778; 779-786; 793; 794-
28   811; 816-817; 824927 -932; 949-951; 1469-1483.

1

**VI.     CONCLUSION**

2          Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial

3    evidence in the record as a whole. Accordingly, this Court ORDERS that Plaintiff's appeal from

4    the administrative decision of the Commissioner of Social Security be DENIED.  The Clerk of

5    this Court is DIRECTED to enter judgment in favor of Defendant Carolyn W. Colvin,

6    Commissioner of Social Security, and against Plaintiff, Jeanne Marie Scott, and close this case.

7
     IT IS SO ORDERED.
8

9          Dated:   __**December 5, 2016**__              _____**/s/ Gary S. Austin**
                                                          UNITED STATES MAGISTRATE JUDGE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28